## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | CRIMINAL CASE NO: 1:23-CR-00034-JEB |
| ) | |
| ) | SENTENCING: SEPTEMBER 15, 2023 |
| **DAVID KRAUSS,** ) | |
| DEFENDANT. ) | |
| ) | |

## SENTENCING MEMORANDUM OF DAVID KRAUSS

David Krauss is a 56-year-old grandfather, a hardworking man with a pristine work ethic who started working seven days a week at the age of 11 and continues working every day, to this day.

David submits to the Court that a fine in the amount of $50 is the appropriate penalty for his first-time offense and first criminal conviction, a Class B misdemeanor petty offense for *Parading, Demonstrating, or Picketing in a Capitol Building*.

The relevant conduct in this case is nonviolent parading on January 6, 2021 in the Capitol Building. David was accompanied by his friend and David's adult son when they followed a crowd of demonstrators through the open doors of the Capitol into the building. Mr. Krauss quietly walked around the ground floor of the Capitol, politely wearing his Covid mask the entire time while indoors, declining to engage in any violence or other misconduct — even trying to stop other protesters from breaking things inside the Capitol — and exiting 16 minutes later without touching anything that did not belong to him. David Krauss did not boast nor discuss the

events at the Capitol on social media or with friends, keeping entirely to himself about his presence and participation. David's conduct was limited solely to his physical presence where it was unlawful.

David accepted responsibility early on for his entry into the Capitol Building and pleaded guilty to this misdemeanor offense. In good faith, and prior to sentencing, he prepaid the Government's requested restitution of January 6 participants in the amount of $500, even though Mr. Krauss had never laid a hand on Government property, nor committed any destruction or property damage whatsoever.

 Considering the defendant's age, clean record, remorse, the facts of his case in the context of other January 6 cases, and the Government's position on left-wing Capitol Building disruptors, a fine in the amount of $50 is an appropriate penalty for a defendant highly unlikely to re-offend.

The Defense submits the foregoing memorandum in support of Mr. Krauss' position on sentencing factors.

## I. DAVID KRAUSS, A HARDWORKING GRANDFATHER

David Krauss was born in Ohio and raised in New Jersey. He was a powerlifter as a teenager and highly engaged in sports.



David was also very hardworking. He started working at the age of 11— delivering newspapers. By high school, he worked every single day, doing three paper routes per day, seven days a week. He then started working two shifts at DelMonte Foods as a fork-truck driver and loading tractor-trailers. He didn't spend the money— he saved all of it.



By age 19, David started his first business doing janitorial work, cleaning floors and toilets; he was doing this in addition to his job at DelMonte. He continued to save his earnings.



At age 20, he married the love of his life, whom he met in middle school. "We stuck together!" By age 21, they were able to buy their first house, a duplex. Two years later, his oldest child and first-born son, Nicholas Krauss, was born. The Krauss

family welcomed a daughter another two years later.



    Mr. Krauss taught himself how to repair and rehabilitate his home by learning from books he read in the library, and started another business — a home refurbishing business. He continues to grow and run that business to this day and has added his son, Nicholas, into the now-family business of home construction, real estate repair and remodeling, and being a landlord. David lives the life of a hardworking, self-made successful businessman, living out the American Dream.



    David Krauss continues to reside in New Jersey and is now a grandfather to five beautiful little kids. He continues to work every day. He enjoys travel and camping. David's future plan is to visit every state in the United States, as well as the Mediterranean coastline.



## II. JANUARY 6TH

On January 6, 2021, David, accompanied by his son and friend, drove from New Jersey to the protest in Washington DC. The gentlemen were respectful, calm, and quiet — and even brought their Covid masks. The men drove together, attended the protest together, entered the Capitol together, exited the building together, and then drove back home to New Jersey together that same afternoon.



Initially, the men went to Trump's speech at the Ellipse. Then, they follow the crowd to the Capitol. They ended up following that crowd inside the Capitol Building. Nothing violent or egregious occurred as they entered. Inside the building, they did not touch or break anything; instead, they stopped protesters from breaking things.. They quietly walked through the hallways, took some photos, and then walked out about 16 minutes after entering. They respectfully wore their masks the entire time.



The men did not use social media and did not brag or speak publicly about their activity at the Capitol.




### III. The Aftermath

On the evening of January 6, after the Trump supporters left the Capitol area, the FBI declared that they were investigating "*violent activity*" at the Capitol.

The very next day, the FBI announced a change— the investment of their full resources into a broader search, an indiscriminate search of "*those involved,*" irrespective of nonviolence or the severity of an individual's involvement.

By January 8, 2021, the DOJ announced their first arrest for *nonviolent activity* that occurred on January 6.

To this day, almost three years later, the FBI's website, continues to say: "We have deployed our full investigative resources and are working closely with our federal, state, and local partners to aggressively pursue *those involved* in these criminal activities." (Emphasis added). For perspective, unlawful activities at the Capitol is a broad category that even includes stepping on the plants that grow on the grounds of the Capitol. *See* 40 U.S.C. § 5104(d).

Almost two years after January 6, on November 15, 2022, David Krauss was arrested for nonviolent parading and unlawful entry into the Capitol Building.



## IV. Defendant's Particularized Perspective

***The Government's broad-brush perspective of what happened on January 6 ignores the particularized perspective of the individuals in the crowd who came to protest lawfully but who followed the crowd into an unlawful demonstration inside of the Capitol***. This defendant, as well as a large portion of the individuals in the January 6 crowd, did not have a complete picture of what was happening around him. The Government has the advantageous benefit of hindsight and an unprecedented collection of video and photographic evidence on which to prosecute all transgressions from January 6, 2021. Yet, the defendants, who were but individuals physically present in a roaring crowd, had a limited vantage point and understanding, and did not share in the advantage of this omniscient luxury while living through that moment.

In at least portions of its sentencing argument, the Government is asking for this Court to penalize the defendant based on its summation of the entirety of the evidence collected during the January 6 investigation. The Government is thus asking for this court to punish the defendant for conduct that he did not know about, for events he did not partake in, for destruction and violence he did not witness, for *severity* he did not experience, and for an *effect* he did not cause nor could foresee. The defense, by comparison, is asking for this Court to limit the penalty to the defendant's conduct and understanding at the time of the offense.

The Government is relying on facts that Mr. Krauss did not know at the time of his petty offense, nor could have known. But **Mr. Krauss did not know *on* January 6 what we know today *about* January 6.** In seeking to punish him for attending a lawful protest that was escalated, by others, into an event of varying degrees of lawlessness, the Government is asking

for the court to consider facts and circumstances that were never known to the defendant before or during his participation in January 6.

Mr. Krauss did not know, nor could he predict, that a political protest in support of Donald Trump would amount to something entirely different. Trump rallies, up until January 6, 2021, had always remained peaceful, even family-friendly events.[1] The defendant did not and could not foresee the violent transgressions others would take on that fateful day. Even DC and Federal law enforcement agencies did not foresee how the protest would devolve.[2] As David Krauss stated to his probation officer, **"I regret entering the capital on January 6th.  I was only there to voice my First Amendment right with no other intentions."**

Although he entered the Capitol Building to protest within it, he did so without understanding the complete picture around him. He did not see what led up to those Capitol Building doors being opened — who opened them, how they were opened — and did not realize the extent of the overall breach of the Capitol and how his presence would be interpreted *ex post facto*.

It is inequitable to hold this defendant responsible for the *results* of a heated rally that grew entirely out of hand. Mr. Krauss should be judged on his participation and what he knew and intended at the time of the transgression.

The Government also confers a type of *shared intent* on all January 6 participants in its standard January 6 sentencing memoranda. Yet, Mr. Krauss was one of the thousands of people

---

[1] David Marcus, *Once A Curiosity Trump Rallies Are Now Joyous Celebrations*, THE FEDERALIST (Feb 11, 2020), https://thefederalist.com/2020/02/11/once-a-curiosity-trump-rallies-are-now-joyous-celebrations/.

[2] Betsy Woodruff Swan and David Lippman, *New Capitol Police document shows how unprepared they were for Jan. 6 riots*, POLITICO (Oct. 29, 2021), https://www.politico.com/news/2021/10/29/capitol-police-documents-unprepared-jan-6-riots-517478; Erik Dahl, *January 6th Intelligence Failure Timeline*, JUST SECURITY (Jun. 7, 2022), https://www.justsecurity.org/81806/january-6-intelligence-and-warning-timeline/.



who gathered together for, what was supposed to be, a lawful, organized protest.[3] He did not

know anyone else who attended other than his son and his friend. **These men came in peace, as**

**did many others**. While a few may have come to riot, **people like Mr. Krauss came to exercise**

**their First Amendment rights** (albeit they ended up doing so in an unlawful manner). There

were thousands of protesters in total — who did not know each other and who did not share a

singular mind. Only a fraction of the protesters had committed violent acts.[4]

The Government does admit, in a boilerplate paragraph added to its January 6 sentencing

pleadings, that "each defendant should be sentenced based on their individual conduct." *See, e.g.*,

*United States v. Cudd*, Case No. 1:21-cr-68-TNM, ECF No. 90, *15 (D.D.C. March 16, 2022).[5]

Nonetheless, the Government *then* asks this Court to disregard this requirement *just this once,*

*just for this group of Trump protesters* — because —

> [E]ach individual person who entered the Capitol on January 6 did so under the most
> extreme of circumstances. As a person entered the Capitol, they would—at a minimum—
> have crossed through numerous barriers and barricades and heard the throes of a mob.
> Depending on the timing and location of their approach, they also may have observed
> extensive fighting with law enforcement and likely would have smelled chemical irritants

---

[3] See Jenni White, *What I Saw At The 'Save America Rally' In Washington, DC On Jan. 6*, THE FEDERALIST (Jan. 11, 2021), https://thefederalist.com/2021/01/11/what-i-saw-at-the-save-america-rally-in-washington-dc-on-jan-6 ("We were absolutely, completely shocked beyond comprehension to hear of any violence, considering our previous experience at Trump rallies and after hearing the president's speech at this one."). *See also* John Daniel Davidson, *'We Just Wanted Our Voices To Be Heard.' Capitol Protesters Speak Out*, THE FEDERALIST (Jan. 14, 2021), https://thefederalist.com/2021/01/14/we-just-wanted-our-voices-to-be-heard-capitol-protesters-speak-out.

[4] As of Sept. 6, 2023, about one-third, 398 of the 1,146 January 6 arrestees, have been charged with Section 111 charges, indicating that an even smaller portion of these individuals committed an actual assault. *See* https://www.justice.gov/usao-dc/32-months-jan-6-attack-capitol. Assault-specific charging data has not been made public bu the DOJ. The Government, in their public press releases, claims that anyone found guilty of a Section 111 charge (145 total defendants have been found guilty of such charges) is automatically guilty of assault on law enforcement; however, in court filings, the Government contrarily claims that assault is not required to prove a conviction under a Section 111 charge and has pursued defendants under this code section for actions that may not constitute actual assault. Consequently, the specific data on how many January 6 defendants were charged with or convicted of violence or assault remains unreported by the DOJ.

[5] Also available at: https://storage.courtlistener.com/recap/gov.uscourts.dcd.227066/gov.uscourts.dcd.227066.90.0.pdf.

in the air. No rioter was a mere tourist that day.

*Id*. Yet, this is simply untrue. Mr. Krauss, for example, did not cross multiple barricades — he walked up on the lawn and through open doors of the Capitol through which others were freely entering and exiting; he smelled no chemical irritants; and, he observed no people fighting with law enforcement officers at the doors he entered through.

The sentencing phase of a criminal case looks at individual blameworthiness. A sentence must be particularized to the individual who stands before the court with evidence relevant to his particular case. The sentencing of Mr. Krauss should be limited to *his* individual conduct and *his* knowledge of the situation at hand for the charge of protesting or parading in a location where such conduct is prohibited, the United States Capitol Building.

## V. Sentencing a Petty Offense, Class B Misdemeanor

A) Sentencing Overview

Mr. Krauss pleaded guilty to a petty misdemeanor offense under 40 U.S.C. § 5104(e)(2) (G) for unlawfully demonstrating inside the United States Capitol Building. *See* 18 U.S.C. § 3559(a)(7). Pursuant to §1B1.9 of the United States Sentencing Guidelines, the sentencing guidelines do not apply to Class B misdemeanor petty offenses. Mr. Krauss is facing no mandatory minimums for this offense. This Class B misdemeanor petty offense carries a maximum penalty of six months imprisonment and a maximum fine of five thousand dollars, in addition to a ten-dollar special assessment. *See* 18 U.S.C. § 19; 40 U.S.C §5109(b); 18 U.S.C. §3571(b)(6). Since unlawful parading in the Capitol building is a petty offense, it does not carry a term of supervised release. 18 U.S.C. § 3583(b)(3).

Pursuant to his plea deal, Mr. Krauss has agreed to pay restitution in the amount of $500 upon sentencing, but he has pre-paid the restitution in full in advance of his sentencing, in a showing of good faith.

While the U.S. Sentencing Guidelines do not apply to this defendant, this court is still required to consider the sentencing factors outlined in 18 U.S.C. § 3553(a) in determining the appropriate sentence. *See* 18 U.S.C. § 3551.

The seven factors for this court to consider under 18 U.S.C. § 3553(a) are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant [*discussed supra*]

(2) the need for the sentence imposed to reflect the four primary purposes of sentencing, i.e., retribution, deterrence, incapacitation, and rehabilitation [*discussed infra*]

(3) the kinds of sentences available (e.g., whether probation is prohibited or a mandatory minimum term of imprisonment is required by statute) [*discussed supra*]

(4) the sentencing range established through the application of the sentencing guidelines and the types of sentences available under the guidelines [*discussed supra*]

(5) any relevant "policy statements" promulgated by the Sentencing Commission [*inapplicable under §1B1.9 of the United States Sentencing Guidelines, commentary to which states: "For the sake of judicial economy, the Commission has exempted all Class B and C misdemeanors and infractions from the coverage of the guidelines."*]

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar *conduct* [*discussed supra*]

(7) the need to provide restitution to any victims of the offense [*discussed supra*]


B) Sentencing Limitations

While the sentencing court has discretion over imposing an appropriate penalty, Congress has placed limits. This court's ability to impose an available penalty is limited by 18 U.S.C. §§ 3551 and 3561(a)(3). *See United States v. Little*, Case No. 22-3018 (D.C. Cir. Aug. 18, 2023); *United States v. Martin*, 363 F.3d 25, 35 (1st Cir. 2004) ("both § 3551(b) and § 3561 require a district court to choose between probation and imprisonment when imposing its original sentence"). This court only has the power to impose (1) a term of probation, (2) a fine as authorized, **or** (3) a term of imprisonment. "Probation and imprisonment are alternative sentences that cannot generally be combined." *United States v. Little*, Case No. 22-3018 (D.C. Cir. Aug. 18, 2023). An exception is carved out in 18 U.S.C. § 3551 for a fine — a fine is

explicitly permitted to be tacked to another penalty. No other tacking or conjunctive exceptions are noted in the Code.

Supervised release is the Code's exclusive form of post-confinement monitoring and may only be ordered if a defendant is sentenced to a term of imprisonment. *See* 18 U.S.C. §3583; *United States v. Little*, Case No. 22-3018 (D.C. Cir. Aug. 18, 2023). Supervised release, however, does not apply to petty offenses. *Id*. Supervised release conditions are subject to the mandatory and discretionary conditions outlined by Congress in 18 U.S.C. §3583.

Probationary conditions that this Court may order are limited to the mandatory and discretionary conditions outlined in 18 U.S.C. § 3563. Imposition of a discretionary condition must be "reasonably related to the factors set forth in section 3553(a)(1) and (a)(2) and to the extent that such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 3553(a)(2)." *See* 18 U.S.C. § 3563(b).[6]

Additional limitations on the imposition of a penalty include the underlying justification for the penalty. For example, a term of imprisonment cannot be imposed or lengthened for rehabilitative purposes, see 18 U.S.C. § 3582(a) and 28 U.S.C. § 994(k); and, a sentence upon revocation of supervised release cannot be imposed for retributive purposes, see 18 U.S.C. § 3583(e). *See also Tapia v. United States*, 131 S.Ct. 2382 (2011). An appropriate sentence is

---

[6] For example, possession of a firearm is a discretionary condition of probation. *See* 18 U.S.C. § 3563(b)(8). Thus, the deprivation of the right to possess firearms must be reasonably tailored to each defendant and his case. If a defendant (1) has never shown signs of violence, aggression, or danger, (2) did not commit any acts of violence during the course of the conduct relevant to this case, (3) this case has no relation to the use of firearms at all whatsoever, and (4) the defendant has not been convicted of a felony — a probatory condition depriving him of the right to possess firearms would be in violation of 18 U.S.C. § 3563's "reasonably related" and "reasonably necessary" clauses, as well as in violation of his Second Amendment right. *See New York State Rifle & Pistol Assn, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *United States v. Cudd*, Case No. 1:21-cr-68-TNM, ECF No. 101 (D.D.C. April 7, 2022) (granting a January 6 defendant's motion to remove probationary condition depriving her of the right to possess firearms, citing *Dist. of Colum. v. Heller*, 554 U.S. 570, 628 (2008)).



defined as "sufficient, but not greater than necessary, to comply with the purposes set forth in [18

U.S.C. § 3553(a)]." *See* 18 U.S.C. § 3553.

Moreover, any sentence imposed by this Court is limited by the Eighth Amendment's

restrictions on excessive fines and cruel and unusual punishment.

### VI. Incapacitation, Rehabilitation, Retribution, Restitution, and Deterrence

The main aims of sentencing have been accomplished pre-sentence in this case.

(A)    ***Rehabilitation*** and ***specific deterrence*** have been achieved through the humiliation of a

an arrest, extensive pretrial supervision with conditions, the process of being publicly shamed in

the media for his conduct, and the plea of guilty to a criminal offense from January 6 that will

permanently mar the defendant's criminal record.



The experience of being arrested, going through court appearances in two federal jurisdictions, conferences with counsel, public shaming in the media and on social media, constant contact with a probation officer — and federal criminal prosecution in and of itself — has made it crystal clear to Mr. Krauss that the First Amendment freedom of expression and protest is not without limitation and that he needs to be more careful, moving forward, *where* he protests (and that's if he ever does so again) and to be more vigilant to what is happening around him. The guilty plea solidifies the defendant's permanent understanding of the bounds of getting carried away with a crowd. Mr. Krauss has learned a very valuable lesson about a fine line that he will not cross again.

As David Krauss stated to probation — "I regret entering the capital on January 6th.  I was only there to voice my First Amendment right with no other intentions." Mr. Krauss is remorseful for unlawfully entering the Capitol Building.

His previously clean record will now be permanently marked with a criminal conviction.

Further rehabilitation and specific deterrence are simply unnecessary for this defendant — especially in light of his age and status as a grandfather.


(B)      In addition to the rehabilitative and deterrent effect, pretrial supervision has already served an ***incapacitative*** effect on Mr. Krauss, a first-time offender.

Mr. Krauss has been on pretrial supervision with restrictions from this court for a duration of 10 months, a very long period of pretrial supervision for a nonviolent misdemeanor offense. He has been perfectly compliant with his restrictions. Pretrial services have served as an

effective mode of supervision and ***incapacitation*** for this defendant, rendering additional

incapacitation unwarranted.

There is no cognizable need to divert additional public resources for more supervision of

a misdemeanor trespass offender who was not violent.

Moreover, as a first-time offender, this defendant has the lowest likelihood to re-offend,

according to the U.S. Sentencing Commission's research on the recidivism of federal offenders.[7]

A first-time offender who has not been convicted of a crime of violence or an otherwise serious

offense should receive a sentence "other than imprisonment," according to Congress. *See* 28

U.S.C. 994(j) ("the general appropriateness of imposing a sentence other than imprisonment in

cases in which the defendant is a first offender who has not been convicted of a crime of violence

or an otherwise serious offense"); U.S.S.G. §5C1.1 (comment n.4).

(C)      As stated previously, ***restitution*** is not a concern in this case as Mr. Krauss has already

made a payment of restitution in the amount requested by the Government, even though he did

not individually damage or destroy any property in the Capitol.

(D)      In observing the arrests, pretrial restrictions and confinements, and relentless prosecution

of January 6 participants through the meticulous reporting of the mainstream media, the public

has been provided with more than sufficient ***general deterrence***. Hundreds of thousands of news

articles have been published about the arrests and prosecutions of January 6 defendants and

numerous congressional hearings related to January 6 have taken place. Donald Trump himself

---

[7] *Recidivism of Federal Offenders Released in 2010*, U.S. SENTENCING COMMISSION (Sep. 30, 2021), https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010.

has been indicted for his role in the events of January 6. On top of that, the DOJ has created unique public-shaming web pages for every January 6 defendant, a digital version of tar and feathering.[8] The public has been put on clear notice that transgressions against the Capitol or the operation of the Federal Government will not be tolerated.

Conservatives and Trump supporters have been uniquely deterred as political groups—having grown genuinely frightened by engaging in any protest against the federal Government, a much deeper (and more troubling) general deterrence than is called for by penal law. For example, when a protest was organized in support of improving detention conditions for January 6 arrestees in September of 2021, only about 100 people arrived to protest, with police and media vastly outnumbering the protesters.[9] When Donald Trump was called into this courthouse for his initial appearance is August of 2023, protesters were difficult to find.[10] "[O]nly around a dozen supporters of the former president were outside the courthouse," reported Politico.[11]

Other political groups have also been deterred from staging protests by the January 6 arrests. The Virginia militia chapter leader of the "Boogaloo" movement (A.K.A. "Virginia Knights" and "Last Sons of Liberty") stated in a recorded video interview on August 18, 2023: "I haven't done any protests since January 6, 2021."[12]

---

[8] Mr. Krauss's devoted DOJ web page can be found here: https://www.justice.gov/usao-dc/defendants/krauss-David.

[9] *Police outnumber protesters at right-wing Capitol rally*, BBC NEWS (Sep. 19, 2021), https://www.bbc.com/news/world-us-canada-58612965.

[10] Kyle Cheney (@kyledcheney), Twitter (Aug 3, 2023, 8:05 AM), https://twitter.com/kyledcheney/status/1687072114359103488.

[11] Andrew Zhang, *Subdued crowd gathers outside Washington courthouse where Trump was arraigned*, POLITICO (Aug. 3, 2023), https://www.politico.com/news/2023/08/03/trump-indictment-courthouse-arraignment-00109643.

[12] Ford Fischer (@FordFischer), Twitter (Aug 18, 2023, 11:32 PM), https://twitter.com/FordFischer/status/1692741297717535039.

Accordingly, the DOJ has already achieved general deterrence through its unprecedented, unyielding prosecution of all defendants, no matter the magnitude of involvement, top to bottom — from the former President of the United States himself to individuals who briefly trespassed.

(E)     ***Retribution*** in this case has also been accomplished before the imposition of sentence — by the general public contributing significantly to the arrest of the individuals photographed inside of the Capitol.[13] A substantial portion of the January 6 defendants have been identified and brought to FBI attention through "crowdsourcing" with the public's assistance.[14] Civilian groups such as *Sedition Hunters* have even been formed to identify and report those who may have been involved. Friends, coworkers, and even family members have reported a substantial portion of January 6 participants. The FBI, in turn, has provided a sense of satisfaction to those who had made reports by arresting the identified individuals, no matter the extent of their role on January 6. Retribution, accordingly, had been accomplished through the public's partnership with the FBI and the DOJ— and the arrests and prosecutions that followed.

Therefore, each of the aims of sentencing — incapacitation, rehabilitation, retribution, restitution, specific deterrence, and general deterrence — have been met in the charging stages of this criminal case, prior to the imposition of the sentence itself.

---

[13] Phil Rogers, '*Sedition Hunters' Seek to Identify Participants in Jan. 6 Capitol Attack,* NBC CHICAGO (11/24/2021), https://www.nbcchicago.com/investigations/sedition-hunters-seek-to-identify-participants-in-jan-6-capitol-attack/2693284; Sukrit Venkatagiri, Tianjiao Yu, Vikram Mohanty, and Kurt Luther, *Sedition Hunters: A Quantitative Study of the Crowdsourced Investigation into the 2021 U.S. Capitol Attack,* WWW '23: PROCEEDINGS OF THE ACM WEB CONFERENCE 2023 (April 2023), https://dl.acm.org/doi/pdf/10.1145/3543507.3583514.

[14] *Researchers study the crowdsourced investigation of Jan. 6, 2021,* VIRGINIA TECH (May 3, 2023), https://liberalarts.vt.edu/news/articles/2023/05/liberalarts-crowdsourced-investigation-study.html.

## VII. Avoiding Sentencing Disparities

According to the Government, January 6 cases are incomparable to preceding criminal cases and thus exempt from fair comparison with any cases that are not January 6 cases. As such, the Government seeks a disproportionately high sentence for all January 6 participants, including ones convicted of nonviolent offenses. The problem with the Government's proposition is that the Government is responsible for creating the uniqueness of the January 6 prosecutions.

### A) Background on Arrests and Punishments of Protest Misconduct on Capitol Grounds

In early October of 2018, the Women's March publicly planned to breach the Capitol and to shut down the Senate deliberations of Trump-nominated Supreme Court Justice Brett Kavanaugh— which, coincidentally, was a constitutionally mandated process under Article II, Section 2 of the United States Constitution.[15]



The left-wing group announced its plans and training initiatives on Twitter. "Hundreds are

---

[15] *In photos: Protesters rally against Supreme Court nominee Brett Kavanaugh*, CNN (Oct 6, 2021), https://www.cnn.com/2018/10/05/us/gallery/anti-kavanaugh-protests/index.html.

getting trained for direct action this morning," the group declared. [16] "Hundreds of people are being trained for today's #CancelKavanaugh action every 30 minutes this morning. We're going to flood the Capitol."[17] "We were planning to shut down the Capitol Building," they exclaimed in another tweet.[18] (*See screenshots supra, p.18.*)

They succeded. Reporter Samantha York reported, "Police are setting up barricades to contain them." (*See screenshots, below).* But Women's March protesters broke through barricades set up by Capitol police and flooded the Capitol building.[19] *The Crisis Magazine* tweeted, "@womensmarch just took the Capitol. Women, survivors, and allies walked straight past the police, climbed over barricades, and sat down on the Capitol steps. ... This was inspiring. We're ready for this."[20] (*See screenshots, below*.)

  

[16] Women's March (@womensmarch), Twitter (Oct 6, 2018, 10:13 AM), https://twitter.com/womensmarch/status/1048576951328407552.

[17] Women's March (@womensmarch), Twitter (Oct 6, 2018, 9:55 AM), https://twitter.com/womensmarch/status/1048572577604006912.

[18] Women's March (@womensmarch), Twitter (Oct 4, 2018, 3:43 PM), h https://twitter.com/womensmarch/status/1047935356673437697.

[19] Adam Rosenberg, *Brett Kavanaugh protesters ignore police barricades, occupy the U.S. Capitol,* MASHABLE (Oct. 6, 2021), https://mashable.com/article/brett-kavanaugh-senate-confirmation-protests-us-capitol.

[20] The Crisis Magazine (@thecrisismag), Twitter (Oct 6, 2018, 2:30 PM), https://twitter.com/thecrisismag/status/1048641711621628576.

More than 300 protesters were arrested on October 4, 2018.[21] Another 101 protesters were arrested the next day, on October 5. Another 164 people were arrested on October 6.[22]



Some of these protesters interrupted the Senate session in the middle of a constitutionally mandated process. On October 5th, six people were arrested in the Senate Gallery and charged with "Unlawful Conduct" under the local DC code, according to a Capitol Police press release.[23] The next day, local news reported, "[o]ne adult female was arrested in the Senate Gallery in the United States Capitol Building for crowding and obstructing around 2:30 p.m. Around 3:45 p.m., 13 people were arrested and removed from several Senate Galleries. They were also charged with crowding and obstructing."[24] Everyone arrested by the Capitol Police was charged under a local DC code section.

---

[21] Sophie Tatum, *More than 300 protesters arrested as Kavanaugh demonstrations pack Capitol Hill,* CNN (Oct. 5, 2018), https://www.cnn.com/2018/10/04/politics/kavanaugh-protests-us-capitol/index.html.

[22] Nahal Amouzadeh, *US Capitol police arrest over 150 anti-Kavanaugh demonstrators*, WTOP (Oct. 6, 2018), https://wtop.com/supreme-court/2018/10/us-capitol-police-arrest-over-150-anti-kavanaugh-demonstrators.

[23] Press release, *U.S. Capitol Police Respond to Multiple Instances of Unlawful Demonstration Activities,* UNITED STATES CAPITOL POLICE (Oct. 5, 2018), https://www.uscp.gov/media-center/press-releases/us-capitol-police-respond-multiple-instances-unlawful-demonstration

[24] Nahal Amouzadeh, *US Capitol police arrest over 150 anti-Kavanaugh demonstrators*, WTOP (Oct. 6, 2018), https://wtop.com/supreme-court/2018/10/us-capitol-police-arrest-over-150-anti-kavanaugh-demonstrators; Ralph Ellis, *Anti-kavanaugh protesters keep up the fight, even after he's confirmed,* CNN (Oct. 6, 2018) https://www.cnn.com/2018/10/06/politics/kavanaugh-protests/index.html.



These October arrests followed hundreds of prior arrests that took place in September —

similar arrests of Progressive protesters interrupting the Senate hearings held for Brett

Kavanaugh.[25] There were a total of 1,188 Kavanaugh protest arrestees between September and

October of 2018. *See United States v. Barry,* 1:18-mj-00111-RMM, ECF No. 10 (D.D.C.

December 14, 2018). For comparison, the Capitol protest arrest number remains lower— 1,146

people have been arrested for January 6 offenses as of the last available report dated September

6, 2023.[26]

---

[25] Amanda Becker, *Hundreds arrested in multi-day protests of U.S. Supreme Court nominee,* REUTERS (Sept. 7, 2018), https://www.reuters.com/article/usa-court-protests/hundreds-arrested-in-multi-day-protests-of-u-s-supreme-court-nominee-idINKCN1LN2K6; Cheyenne Haslett, *Kavanaugh protests escalate, over 120 arrested on Capitol Hill,* ABC NEWS (Sep. 24, 2018), https://abcnews.go.com/Politics/kavanaugh-protests-escalate-120-arrested-capitol-hill/story?id=58048599; *Natalie Delgadillo, Update: Capitol Police Have Arrested More Than 200 Protesters At Kavanaugh Hearings,* DCist (Sept. 4, 2021), https://dcist.com/story/18/09/04/kavanaugh-hearing-arrests.

[26] Press release, *32 Months Since the Jan. 6 Attack on the Capitol,* UNITED STATES ATTORNEY'S OFFICE DISTRICT OF COLUMBIA (Sep. 6, 2023), https://www.justice.gov/usao-dc/32-months-jan-6-attack-capitol.

Yet, the Kavanaugh protesters were charged under the local DC code. Coincidentally, when Trump supporters were *initially arrested on January 6* for unlawfully protesting in the Capitol, they were also charged under the local DC code.[27] It was not until a few weeks later that the DOJ indicted the individuals who were initially charged under the local DC code.[28]

Based on early comments, FBI Director Christopher Wray did not appear to be planning to pursue peaceful Trump protesters for federal offenses, publicly seeking out only those who engaged in "violence and destruction."[29]

But then something changed. The federal Government made a decision about charging and pursuing January 6 participants, a choice that the Government did not make for the Kavanaugh protesters — the DOJ decided that all January 6 transgressors will be charged federally, irrespective of the level of involvement and irrespective of the severity of their individual conduct. Director Wray shifted his investigative focus from those who committed "*violence and destruction*" to the broader group of "*those who participated.*"[30] This is why peaceful protesters, like this defendant, were charged federally instead of under the local DC code.

Unlike local DC charges, Federal charges carry significantly more weight and more expense. Reviewing a Kavanaugh case prosecution and case disposition under DC law illustrates the sharp contrast.

---

[27] Press release, *U.S. capitol police arrests - January 6, 2021,* UNITED STATES CAPITOL POLICE (Oct. 7, 2021), https://www.uscp.gov/media-center/press-releases/us-capitol-police-arrests-january-6-2021.

[28] *See, e.g., United States v. John Anderson*, 1:21-cr-00215, ECF No. 31 (D.D.C. July 8, 2021).

[29] Press release, *Thirteen Charged in Federal Court Following Riot at the United States Capitol,* DOJ (Jan. 8, 2021), https://www.justice.gov/opa/pr/thirteen-charged-federal-court-following-riot-united-states-capitol.

[30] Press release, *Director Wray's Statement on Violent Activity at the U.S. Capitol Building*, FBI (Jan. 7, 2021), https://www.fbi.gov/news/pressrel/press-releases/director-wrays-statement-on-violent-activity-at-the-us-capitol-building-010721.

Sandra Steingraber was one of the Kavanaugh protesters arrested in the Gallery for

disrupting the Senate proceedings. He was arrested by Capitol Police but charged under local DC

code for the offense of "Crowding, Obstructing, or Incommoding" under the Code of the District

of Columbia § 22–1307, which penalizes the act of engaging "in a demonstration in an area

where it is otherwise unlawful to demonstrate and to continue or resume engaging in a

demonstration after being instructed by a law enforcement officer to cease engaging in a

demonstration."[31] The DOJ chose not to get involved. As such, the case was dismissed in DC as

soon as Ms. Steingarber paid a $50 fine.



She was able to obtain this favorable

outcome without counsel under DC's "post-

and-forfeiture" procedure, which is a streamlined dismissal for a person charged with certain

---

[31] Compare with the code section the FBI charged every January 6 participant who entered the Capitol, 40 U.S.C. §5104(e)(2)(G), which makes it unlawful to willfully and knowingly "parade, demonstrate, or picket in any of the Capitol Buildings." And, a mirror version of this law appears under D.C. Code § 10–503.16(b)(7), which also makes it unlawful to willfully and knowingly "parade, demonstrate, or picket within any of the Capitol Buildings."



misdemeanor offenses that allows a defendant to post and simultaneously forfeit a particular sum of money, thereby obtaining a full and final resolution of the criminal charge. Moreover, a "post and forfeit" is not an admission or adjudication of guilt.

Ms. Steingraber later bragged about her disruption of Senate proceedings on Twitter.[32] Unlike its interest in the public statements of, and social media usage of, the January 6th defendants, the DOJ was uninterested in either the social media use or the post-arrest statements of the Kavanaugh protesters.

And, Ms. Steingraber's was not an anomalous case — 1,179 similar Kavanaugh protesters arrested in September and October received identical charges and "post and forfeit" dismissal dispositions. *See United States v. Barry,* 1:18-mj-00111-RMM, ECF No. 10 (D.D.C. December 14, 2018).

Importantly, this was not Ms. Steingraber's first charge or arrest— she had at least one prior arrest in DC at the time, according to DC court records— and for the same conduct. Ms. Steingraber was actually one of 503 people who were repeat offenders and who received a "post and forfeit" disposition. *See United States v. Barry,* 1:18-mj-00111-RMM, ECF No. 10 (D.D.C. December 14, 2018).

Mr. Krauss, by direct comparison to Ms. Steingraber, did not enter the Senate Gallery when he was in the Capitol, he stayed in the hallways. Unlike Ms. Steingraber, Mr. Krauss had not planned to commit a criminal offense ahead of time. Unlike Ms. Steingraber, Mr. Krauss did not directly interrupt Senate proceedings — the Senate recessed before Mr. Krauss entered the

---

[32] Following her arrest, Ms. Steingraber tweeted: "I was one of the women in the Senate gallery who disrupted the vote. Everything about the process leading up to that vote seemed illegitimate." Sandra Steingraber (@ssteingraber1), Twitter (Oct 7, 2018, 12:55 PM), https://twitter.com/ssteingraber1/status/1048980210211872769.

Capitol. And, unlike Ms. Steingraber, Mr. Krauss did not plan his behavior prior to walking in.[33] Moreover, Mr. Krauss had a clean record walking in, unlike Ms. Steingraber.

Comparatively, Mr. Krauss' conduct is significantly less culpable and less egregious than that of Ms. Steingraber. Yet, Ms. Steingraber walked away with a $50 forfeiture and a dismissal under local code (and no legal fees) while Mr. Krauss was federally prosecuted, not offered any kind of dismissal disposition, placed on supervised pretrial release for 10 months during the prosecution, and is awaiting the potential of a sizable penalty that includes up to six months in jail.

In the defense of her January 6 participant clients, undersigned counsel made numerous requests for dismissal dispositions for her clients in hopes of receiving an outcome equivalent to that of the Kavanaugh arrestees. The Government, however, made it clear that the diversion programs, which are touted on the U.S. Attorney's website as "enhancing a fair and efficient criminal justice system," will not be offered to any January 6 participant, even though the DOJ also advertises that, "[e]ach case is subject to individualized review for appropriate disposition."[34] Individuals who happen to be January 6 participants need not apply. *But see United States v. Judd*, 1:21-cr-40, ECF No. 203 (D.D.C. December 28, 2021) (detailing dismissal dispositions for left-wing protest cases, even *felony* charges, in Portland, Oregon).

---

[33] Following her arrest, Ms. Steingraber tweeted: "I was one of the women in the Senate gallery who disrupted the vote. Everything about the process leading up to that vote seemed illegitimate." Sandra Steingraber (@ssteingraber1), Twitter (Oct 7, 2018, 12:55 PM), https://twitter.com/ssteingraber1/status/1048980210211872769. Two years later, she tweeted: "Woke up thinking about the day Brett Kavanaugh was confirmed by the Senate and 13 women stood up in the gallery, 1 by 1, to disrupt the vote and were arrested and media reported they were screaming but actually they were making statements about sexual assault. I was one of them." Sandra Steingraber (@ssteingraber1), Twitter (Nov 3, 2020, 8:31 AM), https://twitter.com/ssteingraber1/status/1323618700457627650. According to D.C. Superior Court online records, Ms. Steingraber has been arrested two additional times after the Kavanaugh incident, for the same type of charge, and it has been identically disposed of under the post-and-forfeit disposition.

[34] *Diversion Programs*, United States Attorney's Office District of Columbia (March 3, 2021), https://www.justice.gov/usao-dc/diversion-programs.

## B) Only One Person Federally Charged for Protest Misconduct in the Capitol Prior to January 6, 2021

Only one Kavanaugh protester was charged federally — *only one* — Tighe Barry. See *Barry,* 1:18-mj-00111-RMM, ECF No. 10 (D.D.C. December 14, 2018). Mr. Barry was charged under 40 U.S.C. §§ 5104(e)(2)(D) and (G), class B misdemeanor petty offenses. Yet when he was initially arrested and charged under the local DC code, Mr. Barry was charged with the more serious offenses of Resisting Arrest and Disorderly Conduct. *See* D.C. Superior Court Docket No. 2018 CMD 013221. Those charges were dropped, and the conduct was not prosecuted at all.

On September 6, 2018, in the public viewing area for the Senate Judiciary Committee hearing for Brett Kavanaugh, Mr. Barry pulled out a large sign with political writing, stood on top of a chair, and shouted something political. As Capitol Police approached him, he leaped forward and pushed a chair into a person who happened to have been sitting in front of him. *Barry,* 1:18-mj-00111-RMM, ECF No. 34 (D.D.C. October 11, 2019). Mr. Barry "had to be carried by his arms and legs out of the committee hearing room while he continued his demonstration." *Id*. At the time, Mr. Barry had 14 prior arrests on his record for similarly disruptive behavior. *Id*.



Tighe Barry was the very first person — ever— who was federally charged for protest or disruptive behavior at the Capitol. *Barry,* 1:18-mj-00111-RMM, ECF No. 10 ("Notably, no other person charged with protest and/or disruptive-type behavior at the U.S. Capitol Grounds has been previously charged in federal court for the District of Columbia."). And, his federal charges did not encompass the full scope of his conduct, such as assault and resisting arrest.

Mr. Krauss is not like Mr. Barry. He didn't personally interrupt an active session of Congress (both the House and Senate were recessed when Mr. Krauss walked into the Capitol), he didn't hurt anyone, he didn't resist arrest, and he didn't defy law enforcement. Mr. Krauss had a clean record and no preexisting intention to walk into the Capitol. Mr. Krauss didn't need to be carried out of the Capitol by his arms and legs. Yet, even though Mr. Krauss' conduct is more comparable to the other 1,179 Kavanaugh protesters who were arrested under the local DC code and given the "post and forfeit" dispositions, Mr. Krauss was prosecuted more aggressively than the lone standout from the Kavanaugh protesters who assaulted a person in the Senate and had a long history of prior arrests.

Nonviolent January 6 protesters received disparate charging treatment as compared to the Kavanaugh protesters. But why?

The only difference between the nonviolent January 6 protesters and the nonviolent Kavanaugh protesters is ***politics***. Mr. Krauss entered amid a crowd of Trump supporters while Ms. Steingraber and the 1,179 others were part of progressive groups. Both groups disrupted constitutionally-mandated proceedings. (The results from the January 6 protest, admittedly, yielded significantly more damage and unrest as a whole.)

The Government would chime in right about now with the extravagant claim, repeated in each of its sentencing memoranda, that the January 6 "attack defies comparison to other events" (an audacious disregard for the 1983 Capitol bombing).[35] More accurately described, January 6 was a collection of politically-inspired, protesting individuals, who lost control and succumbed to mob mentality — a political rally that got out of hand and revealed security weaknesses at our Capitol.[36] There were clearly some violent individuals in the crowd, but they were not the majority that day; the overwhelming majority of January 6 arrestees have been trespassers and unlawful demonstrators.[37]

## C) Federal Prosecution of 2020 Political Riot Participants

The BLM riots of 2020, which preceded the Capitol incident by a few months, show a glaring disparity in DOJ treatment of similarly situated defendants.[38] Around 300 individuals

---

[35] It is important to note that January 6 was not the most destructive event to occur at the Capitol in recent years. The 1983 left-wing extremist bombing at the Capitol blew out "a wall partition and windows, ripping through the Republican Cloakroom, and damaging several works of art on the second floor. The bomb appeared to have been placed on or under a window well seat in a corridor leading to the Senate chamber," according to the Washington Post. *See* Ronald Kessler, *Capitol Bombing*, The Washington Post (11/9/1983), https://www.washingtonpost.com/archive/politics/1983/11/09/capitol-bombing/ed242af4-418f-4d8d-8819-3ba860b425ba. The damage from the politically-motivated explosion cost "at least $1 million to repair," in 1980's currency, according to the Post, which would be over $3.14 million in today's value when accounting for inflation. The combined damage from January 6 remains less than that, at around $2.88 million. *See* https://www.justice.gov/usao-dc/32-months-jan-6-attack-capitol.

Furthermore, no deadly weapons were discharged in the Capitol on January 6. In fact, FBI Executive Assistant Director Jill Sanborn's sworn testimony before the Senate Judiciary Committee on January 11, 2022, revealed that only two January 6 participants were charged with firearms offenses — and they did not bring firearms inside of the Capitol; another three had firearms offenses added for conduct unrelated to entry into the Capitol. Available at https://www.judiciary.senate.gov/meetings/the-domestic-terrorism-threat-one-year-after-january-6. Comparatively, the significantly more serious 1983 Capitol bombing was the discharge, in the Capitol, of weapons capable of mass casualty and mass destruction.

[36] For example, one Capitol police officer claims he was outnumbered 450 to 1, armed with only a baton. Timothy Bella, *Capitol Police officer sues Trump on Jan. 6 anniversary, saying he 'directed the mob' to violence*, THE WASHINGTON POST (Jan. 7, 2022), https://www.washingtonpost.com/dc-md-va/2022/01/07/capitol-riot-trump-police-lawsuit-kirkland.

[37] DOJ Press Release, *32 Months Since the Jan. 6 Attack on the Capitol*, UNITED STATES ATTORNEY'S OFFICE DISTRICT OF COLUMBIA (Sep. 6, 2023), https://www.justice.gov/usao-dc/32-months-jan-6-attack-capitol.

[38] Available video footage of the 2020 riots has been collected and stored at https://riotarchive.com.



(this is a total number from 29 states and Washington, D.C.) were charged by the DOJ, though only for violent or serious offenses such as attempted murder, arson, burglary, assaulting law enforcement, damaging federal property, malicious destruction of property using fire or explosives, felon in possession of a firearm and ammunition, possession of a destructive device, and civil disorder.[39]

### i. Portland, Oregon

In Portland, Oregon, the federal courthouse — along with its federal police officers, local police department, and surrounding neighborhood— was continuously attacked by BLM protesters for a sustained period lasting over 100 days.[40] While the federal crimes were deliberate and premeditated, only about 103 individuals were arrested throughout the four-month ordeal, most for arson and serious assaults on police officers.[41] Yet, the overwhelming majority of





---

[39] Press Release, *Over 300 People Facing Federal Charges For Crimes Committed During Nationwide Demonstrations*, DOJ (Sep. 24, 2020), https://www.justice.gov/opa/pr/over-300-people-facing-federal-charges-crimes-committed-during-nationwide-demonstrations.

[40] James Gordon, *Most Portland rioters have charges DISMISSED by US Attorney: 58 suspects of the 97 arrested have cases scrapped, while 32 more are left pending*, DAILYMAIL  (May 4, 2021), https://www.dailymail.co.uk/news/article-9540207/58-suspects-97-arrested-Portland-Oregon-cases-scrapped-32-left-pending.html.

[41] Unlike their public searchable list of January 6 prosecutions, the DOJ does not publicize its list of Portland cases. A collection of federal cases can be found by private individuals tracking and archiving publicly-revealed individual case data on AntifaWatch.net. See also *Seventy-four face federal charges from Portland protests*, AP NEWS (Aug. 27, 2020), https://apnews.com/article/1c1901dd9c286794791dacc39b0a6727.

these defendants had their serious charges *dismissed*.[42] *See also* Defense Exhibit 1, *Examples of 2020 Riot Case Dismissals in Portland*. These dismissal decisions were made despite a DOJ press release calling the relentless riots "domestic terrorism."[43] Nonviolent participants were not charged in Portland. Compare that to the January 6 defendants, the majority of whom are charged with trespass-related conduct, as discussed *supra*.

 In what world would it be considered "*justice*" for those who committed numerous felonious assaults on police officers to receive more lenient treatment than those who trespassed on public property? Yet that is exactly the word that the DOJ used when dismissing the case of Joshua Warner (AKA "Eva"). Warner was arrested *three separate times* during the 2020 Portland riots for assaults on police, resisting arrest, criminal mischief, another assault on police, etc.[44] The DOJ dismissed all of the charges in exchange for just 30 hours of community service, saying it was "in the best interests of justice." *United States v. Warner*, Case 3:20-cr-00442-HZ, ECF No. 26 (D. Or. Dec. 21, 2021).[45]



---

[42] James Gordon, *Most Portland rioters have charges DISMISSED by US Attorney: 58 suspects of the 97 arrested have cases scrapped, while 32 more are left pending*, DAILYMAIL (May 4, 2021), https://www.dailymail.co.uk/ news/article-9540207/58-suspects-97-arrested-Portland-Oregon-cases-scrapped-32-left-pending.html.; Bradford Betz, *Portland Antifa rioter charged with assaulting police has case dismissed after 30 hours community service*, FOX NEWS (Dec. 30, 2021), https://www.foxnews.com/us/portland-antifa-rioter-charged-assaulting-police-case-dismissed-30-hours-community-service.

[43] Press Release, *Attorney General William P. Barr's Statement on Riots and Domestic Terrorism*, DOJ (May 31, 2020), https://www.justice.gov/opa/pr/attorney-general-william-p-barrs-statement-riots-and-domestic-terrorism, ("The violence instigated and carried out by Antifa and other similar groups in connection with the rioting is domestic terrorism and will be treated accordingly.").

[44] Bradford Betz, *Portland Antifa rioter charged with assaulting police has case dismissed after 30 hours community service*, FOX NEWS (Dec. 30, 2021), https://www.foxnews.com/us/portland-antifa-rioter-charged-assaulting-police-case-dismissed-30-hours-community-service.

[45] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.ord.155702/gov.uscourts.ord.155702.26.0.pdf.



Yet, according to the DOJ, Mr. Krauss' January 6 participation rendered him ineligible for deferred prosecution in D.C. Thus, even though his conduct is nowhere near the level of the Portland defendant, Mr. Krauss will walk away with a criminal record — while the person who feloniously assaulted multiple police officers in Portland, then came back two additional times after being arrested, walked away above reproach. This wildly inequitable and disparate treatment is inexplicable in any way other than political bias.

The small handful of individuals who were actually convicted of their federal crimes in Portland received *significant* leniency from the DOJ at sentencing. For example, after securing a conviction for Kevin Benjamin Weier for the felonious depredation of Government property for the act of setting fire to the Portland federal courthouse— a felony offense punishable by up to 10 years in prison, a $250,000 fine, and three years supervised release— the Government filed a five-page, bare-bones sentencing memorandum that asked to sentence the defendant to a one-year term of probation. *See United States v. Weier*, Case No. 3:20-cr-00263-IM, ECF No. 39, *5 (D. Or.



Nov. 10, 2021).[46] Compare the DOJ's request for Mr. Weier to the sentence that the DOJ requested for January 6 defendant Michael Stepakoff, a rabbi who was convicted of a petty misdemeanor for walking into the Capitol on January 6, shaking hands with a police officer, thanking him for his service, and walking out after 5 minutes — "14 days in custody followed by

---

[46] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.ord.153765/gov.uscourts.ord.153765.39.0.pdf.

three years' probation, 60 hours of community service and $500 in restitution." *See United States v. Stepakoff*, 1:21-cr-00096-RC, ECF No. 36, *27 (D.D.C. January 11, 2022).[47]

Furthermore, Mr. Weier's probation recommendation for a felony arson offense was agreed to via plea agreement which <u>did not</u> reserve the right for the DOJ to seek a terrorism enhancement even though the described activity was deemed terrorism by the Attorney General. *See United States v. Weier*, Case No. 3:20-cr-00263-IM, ECF No. 35 (D. Or. Aug. 19, 2021). Yet, the *Class 1 misdemeanor plea agreements for some of the nonviolent January 6 trespassers* audaciously reserve the option for the DOJ to attempt to seek (what would amount to an unlawful) upward departure for terrorism under U.S.S.G. § 3A1.4, n. 4, a sentencing guideline that is not even applicable to misdemeanor cases, but which the DOJ refuses to exclude from the plea agreements. *See, e.g.*, *United States v. Cudd*, Case No. 1:21-cr-68-TNM, ECF No. 75, *4 (D.D.C. Oct. 13, 2021).[48]

### ii. Seattle, Washington



---

[47] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.227275/gov.uscourts.dcd.227275.36.0.pdf.

[48] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.227066/gov.uscourts.dcd.227066.75.0_1.pdf.



In Seattle, BLM protests led to similar arson and violence as in Portland — with similar commiseration from the DOJ.

While the destruction in Seattle was extensive, only two defendants were federally charged.[49] A sentencing memorandum for the woman charged with felony arson of five police vehicles revealed how the DOJ viewed the progressive BLM protest in Seattle: "an important cause" that "should have been an inspiring event" with an "important message." *See United States v. Channon*, Case No. 2:20-cr-00129-JCC, ECF No. 76 (W.D. Wash. Feb 8, 2022).[50] In the sentencing memorandum for the man accused of bringing a firearm to the BLM protest with the intent to kill police officers — who was arrested after he threw a 16-ounce can of beer through the window of a police cruiser, striking an officer in the face — the Government described the BLM riot that resulted in millions of dollars in property damage in Seattle as "a peaceful but volatile protest." *See United States v. Parker*, Case No. 2:20-cr-00084-RSM, ECF No. 116 (W.D. Wash. Jun. 2, 2023).[51] It's almost as if the DOJ chose such language to taunt conservatives, who were outraged at CNN for referring to the arsonous BLM riots in Kenosha, Wisconsin as



---

[49] Amy Radil, *These are the people who face criminal charges in Seattle after the protests*, KUOW (Jul. 9, 2020), https://www.kuow.org/stories/who-faces-criminal-charges-related-to-seattle-area-protests-here-s-a-roundup.

[50] Also available at: https://storage.courtlistener.com/recap/gov.uscourts.wawd.288533/gov.uscourts.wawd.288533.76.0.pdf.

[51] Also available at: https://storage.courtlistener.com/recap/gov.uscourts.wawd.287719/gov.uscourts.wawd.287719.116.0.pdf. *See also* Katherine Anne Long and Paul Roberts, *Downtown businesses assess damage, weigh reopening after nights of riots, looting and chaos,* THE SEATTLE TIMES (May 31, 2020), https://www.seattletimes.com/business/local-business/downtown-businesses-assess-damage-weigh-reopening-after-nights-of-looting-and-chaos; Claire Sprang, *Seattle To Pay $3.6 Million in Damages to Businesses Over 2020 BLM Riots*, THE WASHINGTON FREE BEACON (Feb. 22, 2023), https://freebeacon.com/democrats/seattle-to-pay-3-6-million-in-damages-to-businesses-over-2020-blm-riots.

"firey but mostly peaceful."[52]

The rally on January 6 has only been described by the DOJ in sentencing memoranda as "a violent attack" and "a large and violent riot." *See, e.g.*, *United States v. Cudd*, Case No. 1:21-cr-68-TNM, ECF No. 90, *1-2 (D.D.C. March 16, 2022).[53] The Government has never made a sympathetic statement for the underlying non-criminal protest on January 6 outside of the Capitol— a protest that could technically also be described as an *important cause* that *should have been an inspiring event*. The hundreds of thousands of January 6 protesters who came to DC to protest election integrity, who remained outside the Capitol and broke no laws, are not given any credit by the Government in the way that credit was given by the DOJ to non-criminal protesters in Seattle.[54] January 6 has never been described by any DOJ prosecutor as "a peaceful but volatile protest." Yet both protests started out similarly — peacefully — and degraded to chaotic volatility that included property damage and assaults on officers (to which the defendants of this case made no personal contributions, as discussed previously).

---

[52] *See* Joe Concha, *CNN ridiculed for 'Fiery But Mostly Peaceful' caption with video of burning building in Kenosha*, THE HILL (Aug. 27, 2020), https://thehill.com/homenews/media/513902-cnn-ridiculed-for-fiery-but-mostly-peaceful-caption-with-video-of-burning.

[53] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.227066/gov.uscourts.dcd.227066.90.0.pdf.

[54] See, e.g., Jenni White, *What I Saw At The 'Save America Rally' In Washington, DC On Jan. 6*, The Federalist (Jan. 11, 2021), https://thefederalist.com/2021/01/11/what-i-saw-at-the-save-america-rally-in-washington-dc-on-jan-6 ("There were hundreds of thousands of people all standing together peacefully in one spot for more than five hours. A small percentage of this group entered the capitol and perpetrated mayhem while hundreds of thousands were peacefully milling around outside. Video of the event shows other attendees remonstrating with some who broke windows or stood on statues, telling them to stop.").

### iii. Minneapolis, Minnesota

Perhaps the most startling disparity of all can be seen in a memorandum filed by the Government in the District of Minnesota, where hundreds of BLM rioters engulfed Minneapolis in flames— burning homes, businesses, and even people.

On May 28, 2020, in the middle of a BLM riot, a convicted felon, who was on probation at the time, set fire to a pawn shop, saying "Fuck this place. We're gonna burn this bitch down." *United States v. Lee*, Case No. 0:20-cr-00168, ECF No. 67, *2 (D. Minn. Nov. 4, 2021).[55]  A 30-year-old man was burned to death in that fire. *Id*. at *3. In its sentencing memorandum, the DOJ brazenly excused the homicide— "[the defendant] appears to have believed that he was, in Dr. King's eloquent words, engaging in 'the language of the unheard.'" *Id*. *9. The Government's memo does not resolve the issue of how the defendant's words at the time of the offense are entirely inconsistent with his post-arrest explanation. Instead, citing Dr. Martin Luther King, Jr., the Government requested *half* of the guidelines sentence for the homicide. *Id*. *7, 12. The Government's sentencing memorandum reads more like that of a defendant's, with the DOJ advocating on behalf of the defendant, sympathizing with his alleged political views, and justifying allegedly political actions.





---

[55] Also available at
https://storage.courtlistener.com/recap/gov.uscourts.mnd.189358/gov.uscourts.mnd.189358.67.0_2.pdf.

<u>iv. Washington, D.C.</u>

In May 2020, BLM protesters set fires around the White

House, caused the President to retreat to a bunker, and clashed

with federal law enforcement for days on end.[56] Depicted on the



video released by the Department of the Interior, protesters

were pushing police shields, assaulting federal officers, and

disobeying orders.[57] CNN televised protesters tugging a

protective barrier away from federal officers.[58] None of these



individuals were investigated or charged for their conduct. But

January 6 defendants who committed the same acts were

investigated, arrested, and charged.[59]

On May 31, 2020, then-Attorney General William Barr

announced that "*violent radical agitators*" from the BLM



protests in D.C. would be investigated and charged.[60] Indeed,

the DOJ apprehended and charged individuals for acts of bank

robbery, bank burglary, arson at the Supreme Court, Molotov

---

[56] *Secret Service Statement on Pennsylvania Avenue Demonstrations*, UNITED STATES SECRET SERVICE, (May 31 2020), https://www.secretservice.gov/newsroom/releases/2020/05/secret-service-statement-pennsylvania-avenue-demonstrations-0; Shawn McCreesh, *Protests Near White House Spiral Out of Control Again*, THE NEW YORK TIMES (May 31 2020), https://www.nytimes.com/2020/05/31/us/politics/washington-dc-george-floyd-protests.html.

[57] Department of the Interior Press Secretary (@DOIPressSec45), Twitter (Jun 24, 2020, 1:53 PM), https://twitter.com/DOIPressSec45/status/1275849473701433345.

[58] Andy Ngô (@MrAndyNgo), Twitter (May 30, 2020, 1:30 AM), https://twitter.com/MrAndyNgo/status/1266602847182786567.

[59] See, e.g., *United States v. DaSilva*, Case No. 1:21-cr-00564, ECF No. 48 (D.D.C. May 19, 2023).

[60] Press Release, *Attorney General William P. Barr's Statement on Riots and Domestic Terrorism*, U.S. DEPARTMENT OF JUSTICE (May 31, 2020), https://www.justice.gov/opa/pr/attorney-general-william-p-barrs-statement-riots-and-domestic-terrorism.

cocktail attacks on police, and attacks on the Lincoln Memorial.[61] The January 6 investigation, on the other hand, was not limited to "*violent radical agitators*." Instead, on January 7, 2021, Christopher Wray announced the investment of the full resources of the FBI into an indiscriminate search of "*those involved*" in January 6 misconduct, irrespective of nonviolence or the severity of an individual's involvement.[62] The result is that two-thirds of the individuals arrested for January 6 participation are charged with only nonviolent conduct.[63]

 

The overt disparity between the Government's choice to only pursue *violent agitators* from left-wing protests, and yet *all individuals* from the January 6 protest, yields an unavoidable conclusion: had a January 6 protester committed certain acts in the middle of a BLM protest he

---

[61] *See United States v. DaSilva*, Case No. 1:21-cr-00564, ECF No. 59, *9 (D.D.C. Jun. 9, 2023).

[62] FBI Press Release, *Director Wray's Statement on Violent Activity at the U.S. Capitol Building* (Jan. 7, 2021), FBI, https://www.fbi.gov/news/press-releases/director-wrays-statement-on-violent-activity-at-the-us-capitol-building-010721.

[63] *See 29 Months Since the Jan. 6 Attack on the Capitol*, U.S. Department of Justice (Jun. 6, 2023), https://www.justice.gov/usao-dc/29-months-jan-6-attack-capitol.



would have gotten off scot-free, but because he committed such acts in the middle of a Trump protest he was charged. That political discrepancy is very troubling.

v. Disparate Treatment of January 6 Participants

The Government's disparate treatment of the January 6 protesters, as compared to the BLM and Kavanaugh protesters — as well as the Government's cherry-picked view on the righteousness of only certain kinds of political riots — provides much-needed context to the otherwise incomparable arrests and sentencing requests for January 6 defendants. Had the federal government treated all riots in the same manner and prosecuted all rioters in the same manner this sentencing memo would have been a lot more simplistic. But alas the Government has forced this argument.

The DOJ's deliberate omission of the federal prosecution of BLM and Kavanaugh protesters is how the Government justifies the claim that January 6 participants could only be compared to other January 6 participants for purposes of criminal penalty imposition. Indeed, there are almost no nonviolent protest cases to compare to the January 6 defendants. That is because the *DOJ caused this disparity* by *only* having prosecuted nonviolent January 6 defendants — by choice.

As we learned **from the logic of *Wickard v. Filburn*, 317 U.S. 111 (1942), a deliberate decision *not to do something* can create a legally-significant substantial impact through that inaction**. The discussion *supra* illustrates the Government's clear decision not to prosecute various offenses from other political protests which plagued the country in 2020. But as a result,

an entire class of politically-motivated criminal defendants was omitted from sentencing comparables.

Accordingly, a question can be posed: *does the Government's decision not to charge Kavanaugh protesters under federal law "exert a substantial effect" on the comparable sentencing cases available to this court?* (To borrow phrasing from *Wickard)*. The inevitable answer, as we have explored here, is — yes. *See also United States v. Griffin*, 549 F. Supp. 3d 49, 59 (D.D.C. 2021)* ("Disparate charging decisions in similar circumstances may be relevant at sentencing.") *United States v. Sandlin*, 575 F. Supp. 3d 16 (D.D.C. 2021) (citing *Griffin* for the same proposition); *United States v. Judd*, 579 F. Supp. 3d 1 (D.D.C. 2021) (same); *United States v. Robertson*, 588 F. Supp. 3d 114 (D.D.C. 2022) (same).

The defendant thus asks this Court to take into consideration the defendant's conduct in the context of the Kavanaugh protests of 2018 and the BLM protests of 2020, and the dispositions for those defendants, in order to render a fair sentence.


**D) Comparison to Other January 6 Defendants**

Nonviolent January 6 defendants did not walk away with a "post and forfeiture" disposition, like Ms. Steingraber from the Kavanaugh protest at the Capitol, nor a dismissal after community service, like someone who assaulted a federal police officer in Portland, nor complete non-prosecution, like the majority of other BLM protesters who could have been prosecuted for misdemeanor and even felony offenses committed in front of the White House. Instead, January 6 defendants who had been charged with misdemeanor offenses have been

convicted and faced sentences ranging from a fine all the way up to months of incarceration plus community service, and up to five years of probation.[64]

There are certain January 6 cases specifically comparable to that of this defendant which the court should review and consider.

<u>List of January 6 cases to consider in evaluating the proper penalty for Mr. Krauss:</u>

- Danielle Doyle was convicted of 40 U.S.C. § 5104(e)(2)(G) and sentenced to 2 months of probation and a $3,000 fine, in addition to restitution. *United States v. Doyle*, Case No.1:21-cr-00269-TNM, ECF No. 34 (D.D.C. Oct. 5, 2021). Ms. Doyle entered the Capitol Building through a broken window, then explored multiple floors of the Capitol, before exiting 20-25 minutes later.



- Sean Cordon was convicted of 40 U.S.C. § 5104(e)(2)(G) and was sentenced to 2 months of probation and a $4,000 fine, in addition to restitution. *United States v. Cordon*, et. al., Case No.1:21-cr-00269-TNM, ECF No. 37 (D.D.C. Nov. 11, 2021). He entered through a broken window, walked around, then exited an unspecified time later.



---

[64] The Government's charting of January 6 sentences is available at: https://www.justice.gov/file/1593211/download

- William Blauser was convicted of 40 U.S.C. § 5104(e)(2)(G) and was sentenced only to a $500 fine, in addition to restitution. *United States v. Blauser*, et. al., Case No.1:21-cr-00386-TNM, ECF No. 108 (D.D.C. Feb. 3, 2022). Blauser walked past three officers into the Capitol, walked around, and walked out.



- Jenny Cudd was convicted of 18 U.S.C. § 1752(a)(1) and sentenced to 2 months of probation and a $5,000 fine, in addition to restitution. *United States v. Cudd*, Case No. 1:21-cr-00068-TNM, ECF No. 97 (D.D.C. Mar. 24, 2022). She followed a crowd through open doors, walked around taking photos, prayed in a prayer circle, then walked out a few minutes later. Ms. Cudd proudly discussed her participation on social media and on television.



- Paula Conlon was convicted of 40 U.S.C. § 5104(e)(2)(G) and was sentenced to 12 months of probation, in addition to restitution. *United States v. Conlon*, et. al., Case No.1:22-cr-00171-JMC, ECF No. 64 (D.D.C. Jan 18, 2023). She entered the Capitol through a broken window, walked around for 3 minutes, then walked out.



- Eric Cantrell was convicted of 40 U.S.C. § 5104(e) (2)(G) and was sentenced to 3 months of probation and a $1,000 fine, in addition to restitution. *United States v. Cantrell*, et. al., Case No.1:22-cr-00121-TNM, ECF No. 84 (D.D.C. Mar. 30, 2023). Mr. Cantrell entered the building through open doors, walked around for approximately 8 minutes, then walked out.



- Brian Sizer was convicted of 40 U.S.C. § 5104(e)(2)(G) and was sentenced to 12 months of probation, in addition to restitution. *United States v. Sizer*, Case No.1:22-cr-00376-JEB, ECF No. 32 (D.D.C. Apr. 5, 2023). He entered the building through open doors, walked around the Capitol, entered offices, then exited after being gassed— about 12 minutes after entering.



Mr. Krauss' culpability is lower than each of the January 6 defendants described above. Unlike defendants who entered through broken windows, he entered through open doors. Unlike defendants who went inside offices, he only stayed in the hallways. Unlike defendants who bragged about their participation on social media, Mr. Krauss made no statements. Unlike defendants who climbed on the walls of the Capitol, Mr. Krauss stayed in normal walking areas. Unlike every other defendant on this list, Mr. Krauss wore a Covid mask the entire time that he

was inside the building. Mr. Krauss also expressed regret. And, commendably, Mr. Krauss tried to stop others from breaking government property inside of the Capitol Building.

Mr. Krauss's case is one of the lowest culpability cases of all January 6 defendants, if not *the lowest*. Mr. Krauss' sentence should reflect his culpability level. Mr. Krauss' sentence should be lower than that of each of the defendants listed above. Mr. Krauss should be sentenced to no more than a fine, the sentence ordered for William Blauser. *See United States v. Blauser*, et. al., Case No.1:21-cr-00386-TNM, ECF No. 108 (D.D.C. Feb. 3, 2022)

## VIII. Appropriate Sentence for this Defendant

Considering David Krauss' clean record, his age, and the facts of his case in light of other January 6 cases *and* the Government's position on and treatment of the BLM and Kavanaugh protest cases, a reasonable penalty (in addition to the already-imposed penalty of a conviction with a criminal record, 10-month-long pretrial supervision, and payment of restitution) should be a $50 fine — the same amount paid by Ms. Steingarber, the Kavanaugh protester who was arrested in the Capitol but who avoided prosecution through DC's post and forfeit disposition.

The sentence proposed by the defense is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a), and within the limitations placed on this Court by Congress and the Eighth Amendment.

Respectfully submitted,
By Counsel:
_____/s/_____
Marina Medvin, Esq.
*Counsel for Defendant*
MEDVIN LAW PLC
916 Prince Street
Alexandria, Virginia 22314
Tel:  888.886.4127
Email: contact@medvinlaw.com

## <u>CERTIFICATE OF SERVICE FOR CM/ECF</u>

I hereby certify that on September 8, 2023, I will electronically file the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

_____/s/_____
Marina Medvin, Esq.